An examination of the two affidavits executed by plaintiff's attorney, quoted in the majority opinion, fulfill the requirements of Rule 4.3(d)(1), A.R.Civ.P. The evidence shows that the February 21, 1983, letter of plaintiff's attorney was received by defendant. He did not reply to this letter, and he subsequently moved from his 1201-B Primiter Drive address in Mobile without either telling his neighbors or leaving a forwarding address with the post office. He did not have a telephone number listed in the Mobile directory. The defendant himself, however, testified that his telephone number had never been unlisted. According to McGraw, the insurance adjuster, the defendant did not give the adjuster a forwarding address, and, in fact, the adjuster never had any notice of a change in defendant's address. The adjuster himself had difficulty locating March, as shown by his file, part of which we quote:
 "At no time have we had any contact by the insured or the attorney concerning any suits filed.
 "Upon obtaining this court order, I have attempted to locate the insured without success.
 "His wife did work at the Hickory House Restaurant and she is no longer employed there. No one I spoke with yesterday could remember anything about her whereabouts.
 "I found that the insured no longer resides at 1201-B Perimeter [throughout the record the street is usually referred to as "Primeter"] Drive, Mobile, AL. This is a housing project. I checked with neighbor, Annie Porter at 1200-B and she indicated they had moved over a year ago. She did not know of any way of contacting them.
 "We also checked with neighbor, William Ship at 1203 and he had no knowledge of their identity or whereabouts.
 "We found a neighbor at 1200-A, Franklin Baughn who recalled the insured living there and him being a commercial fisherman. He indicated he thought they had relocated to the Bayou La Batre area.
 "I checked with the housing authority manager at Brookly Center and they had a forwarding address of P.O. Box 168, Dauphin Island, AL 36528. Their records indicate they moved out of the project in May, 1984.
 "From the housing authority records I found the only next of kin listed was a J.W. Kislanko who is most probably Mrs. Marsh's [March's] ex-husband. I obtained a phone number 478-6469, however, I have been unable to make contact with him as of yet."
There is no evidence that would indicate any more success by the plaintiff's attorney had he made these or similar attempts to locate the defendant. *Page 73 
The facts establish that service by certified mail was attempted on two occasions at the same address, an address at which they knew the defendant had received mail because of his adjuster's earlier reply to plaintiff's lawyer. On each of those occasions the certified mail was sent twice, and returned "not claimed." The record discloses that defendant was residing in Mobile County when the publication notice appeared in theMobile Register. Service was also attempted by the Mobile County sheriff's office at the same address used in the certified mail and returned "not found." No reason was established, moreover, why or how plaintiff's attorney could, or should, have known the name of defendant's father so as to telephone him as to his son's whereabouts.
The record also discloses that plaintiff's lawyer wrote four letters to defendant's adjuster during September, October, and December 1983 — the December letter containing copies of the previous three letters. No written replies were received. In that connection, plaintiff's lawyer denied having any telephone conversations with defendant's adjuster concerning the subject matter of those letters. Contrary to that position, defendant's adjuster testified that he and plaintiff's lawyer discussed these by telephone:
 "Q. Prior to September 6, I believe you testified that prior to September the 6th that you had a phone conversation with me.
 "A. I have one noted there specifically by date on August the —
"Q. — 26.
"A. 26.
 "Q. Okay, sir. And I think it's your testimony that in response to that, you received my September 6th letter; is that correct; in which you received the bills on Mr. Stringer.
"A. That we had been speaking of, yes, sir.
 "Q. Yes, sir. Did you reply to my September 6th letter?
"A. Not in any written form, no sir.
"Q. Did you reply in any form?
"A. Yes sir, I did.
"Q. What form was that?
"A. Telephone.
 "Q. It's your testimony here today under oath that you talked with me on the telephone subsequent to September 6th of 1983?
"A. Yes, sir.
 "Q. If you did that, Mr. McGraw, do you have any idea why I would again write you on September 28th and say please reply to my letter of September 6 in connection with the above case. If we do not hear from you within a week we will have no alternative but to proceed with a lawsuit in this matter.
 "A. I was somewhat baffled when I got this one because we had talked —
 "Q. — It's your testimony that I wrote you that letter in spite of the fact that we had had a conversation?
 "A. I don't know. I'm saying we had a telephone conversation between the times of those two.
"Q. Do you have a record of that?
"A. I can get it from my telephone.
"Q. You don't have it with you here today?
"A. No, sir, I don't because I was —
 "Q. — Okay, sir. Now, you did not reply to my September 28th letter in writing, did you?
"A. No, sir, I didn't.
 "Q. I wrote you again on October 7, marked as Defendant's Exhibit Number Eight, and that letter said I have still had no reply to my letter of September 6, 1983, concerning the above matter. Please let me hear from you on this matter within one week.
"Did you respond to that letter?
 "A. Not in writing, but I believe my telephone records will show that we did talk within that week.
 "Q. You called me again. Is that your testimony? And I still wrote you that letter?
"A. Yes, sir.
 "Q. You have any idea why I would write you a letter like that if we had talked on the telephone?
"A. No, sir. *Page 74 
 "Q. Did it ever occur to you to document the phone conversations in writing to me?
"A. It's in my records.
"Q. You didn't document it in writing, did you?
"A. It's in my telephone records.
"Q. You did not write me a letter, did you?
"A. No, we talked.
 "Q. You never corresponded with me, did you, other than the July 25th letter?
 "A. That's the only letter, yes, sir, I believe that I wrote you.
"Q. The only letter that you ever wrote me?
"A. Yes, sir.
 "Q. In spite of receiving my September 6th letter and September 28th letter?
"A. Yes, sir.
"Q. Then, you received the October 7th letter?
"A. Yes, sir.
 "Q. I guess you wondered then what I was writing you that letter for; is that right?
"A. Yes, sir.
"Q. And you still didn't reply in writing?
"A. We did not.
 "Q. Then, I wrote you again on December 15, 1983, marked as Defendant's Exhibit Nine.
"A. Uh-huh.
"Q. Did you receive that letter?
"A. Yes, sir.
"Q. Did you respond in writing to that letter?
"A. No, not in writing.
"Q. Did you respond in any way?
"A. Yes, sir.
"Q. How?
"A. By telephone.
 "Q. Do you have a record of that with you here today?
"A. No, sir, not with me today."
This exchange raised conflicting inferences. If, as defendant argues, it was incumbent upon plaintiff's counsel to notify defendant's adjuster of the filing of the lawsuit, it was equally incumbent upon the adjuster, in view of the correspondence between them, to make a similar inquiry, since that correspondence specifically referred to the threat of a lawsuit. The absence of any inquiry from the adjuster would tend to support the claim of reasonable diligence on the part of plaintiff's lawyer.
As this Court stated in Smith v. Clark, 468 So.2d 138 (Ala. 1985):
 "Clause (6) of this rule [60(b)] and the first five clauses of this rule are mutually exclusive, and relief cannot be obtained under (6) if it would have been available under one of the other five clauses. Assured Investors Life Ins. Co. v. National Union Associates, Inc., 362 So.2d 228
(Ala. 1978); City of Birmingham v. City of Fairfield, 396 So.2d 692 (Ala. 1981). Consequently, relief under Rule 60(b)(6) is available only under circumstances not arising under 60(b)(1)-(5); Rule 60(b)(6) is reserved for 'extraordinary circumstances,' and is available only in cases of 'extreme hardship or injustice,' City of Birmingham, supra, or when the case involves 'aggravating circumstances,' Giles v. Giles, 404 So.2d 649 (Ala. 1981). The decision to grant or to withhold Rule 60(b)(6) relief being discretionary, the trial court's decision will not be reversed except for an abuse of that discretion. Textron [, Inc.] v. Whitfield, 380 So.2d 259 (Ala. 1979).
 "On the other hand, a Rule 60(b)(4) motion has a different standard of review on appeal. When the grant or denial turns on the validity of the judgment, discretion has no place for operation. If the judgment is void, it is to be set aside; if it is valid, it must stand. Wonder v. Southbound Records, Inc., 364 So.2d 1173 (Ala. 1978). A judgment is void only if the court rendering it lacked jurisdiction of the subject matter or of the parties, or if it acted in a manner inconsistent with due process. Ibid."
Under the facts, we should not conclude that the trial court abused the discretion vested in it under subsection (6). The validity of the affidavits pursuant to Rule *Page 75 
4.3(d)(1) is unchallenged, and, indeed, comply with that rule. The efforts of plaintiff's attorney to communicate with defendant and his adjuster disclose a level of diligence reasonable at the very least, and thus do not place this case within the class of cases involving "extraordinary circumstances." Moreover, those very facts detailed above disclose a consistency with due process, in accord with the mandate of Wonder v. Southbound Records, Inc., 364 So.2d 1173
(Ala. 1978). Defendant has not shown that the Clarke Circuit Court acted otherwise than within its power, for it clearly possessed jurisdiction of the subject matter and, under the requirements of Rule 4.3(d)(1), A.R.Civ.P., jurisdiction of the defendant. The decisions relied upon by the defendant for a contrary result, I respectfully note, are distinguishable. The case of Webb v. Galloway, 442 So.2d 53 (Ala. 1983), accords with the decision I would reach on this point.
Moreover, we should not conclude that the trial court abused its discretion by rejecting the argument that it should set aside the default judgment on the basis that venue was proper only in Mobile County. The trial court's position is tenable.
It is true that Rule 82, A.R.Civ.P., requires that personal actions against permanent residents of the state may be brought "either in the county where the act or omission . . . occurred, or in the county of the permanent residence of the defendant." Even so, improper venue is a defense under Rule 12(b), A.R.Civ.P., and may be waived. Ex parte Tanksley, 418 So.2d 94
(Ala. 1982). As was stated in Jordan v. Guaranty Pest Control,Inc., 292 Ala. 601, 606, 298 So.2d 244, 248 (1974): "[I]t seems clear that the appropriate method to attack improper venue is to appear and make timely motion, and on a failure to do so the improper venue is waived." In this case, the trial court could have found that the defendant not only did not appear, but gave the reasonable appearance of avoiding service, to the extent that a proper default judgment could be entered against him. The Rules of Civil Procedure must be construed so as to accommodate each other; it would be disconsonant to allow the proper entry of a default judgment upon a nonappearing party, only to later require the removal of that judgment because the defaulting party chose not to appear and plead. Cf., Ex parteStarr, 419 So.2d 222 (Ala. 1982). Relief under Rule 60(b)(6) is not intended to relieve a party from the free, calculated, and deliberate choices he has made. Tichansky v. Tichansky,54 Ala. App. 209, 307 So.2d 20 (1974), cert. denied, 293 Ala. 775,307 So.2d 24 (1975).
Finally, the fact that the defendant may have possessed a meritorious defense does not mean that the trial court erred in refusing to set aside the default judgment.
The record contains testimony of both the plaintiff and the defendant. The plaintiff testified:
 "Q. Were you injured as a result of being hit by that automobile?
"A. Yes, sir.
 "Q. Would you tell the Court what happened on that occasion and how you were injured?
 "A. Well, I started across the street and my daughter — and granddaughter and great-granddaughter was ahead of me and they was kind of behind each other and then they went on ahead. I started across the street. The man was up the street a pretty good piece, almost a block, I reckon, and I started across and the next thing I knew, I was hit and laying on the ground. I did throw my hand out and tried to push myself away when he was right on me, but I didn't have much luck doing that and I don't suppose he run over me but he hit me and knocked me down.
"Q. How were you injured?
 "A. Well, my hip was broke, shoulder was broke, elbow and arms was broke, my knee was — I was torn in my left knee and my ankle was messed up somewhat. I don't know. I don't remember along about that time, it was kind of hazy, but from what they tell me that whole left side was either fractured or broke.
". . .
 "Q. Was it your opinion that the automobile was travelling too fast? *Page 76 
 "A. It had to be, I believe. Yeah, in my opinion it had to be travelling fast to come almost a block as quick as it did. When I looked up — they know I wouldn't walk in front of the automobile, if I had known it.
 "Q. Did you look before you started crossing —
 "A. — Yes, sir, I looked up that way and the other way, and started on across it — my daughter was a little bit behind them and I was a little bit behind her, from the parking lot, and I got there and looked and I started across and that's about all I can — I never did black out, but everything is kind of hazy from then on for a good long while."
The defendant, on the other hand, testified that he was driving at 5 m.p.h. when the plaintiff stepped into the side of his car, under circumstances in which he could not avoid the accident. This testimony was corroborated by a witness, Carl Patrick Olsen:
 "Q. "Mr. Olsen, you said you were standing at your car unlocking the door.
 "A. I hadn't reached the door yet. I had rounded the front of the hood.
"Q. Okay. And what did you see?
 "A. I saw this elderly man, old man, fixing to walk into the side of a moving vehicle.
 "Q. Okay. What type — did you notice the vehicle prior to that?
 "A. No, I couldn't even tell you what color it was.
 "Q. Do you know whether that accident that you're talking about that the driver of the car — have you subsequently learned that that was Mr. March that was the driver of that car?
"A. Well, yeah.
 "Q. And you subsequently learned that the man walking was Mr. Stringer.
"A. Right.
 "Q. And what did you see occur as you said you saw him walking into the car? Please tell the Court exactly what you saw occur.
 "A. Well, when I looked the car was in motion and he was in motion and he wasn't looking where he was going. He was kind of glancing back and I knew — can I say that I said that to my wife or not?
"THE COURT: No, sir.
"A. No.
"MR. FLOYD:
"Q. Just tell us what you saw.
 "A. Okay. I saw the man fixing to step into the side of the car.
"Q. Okay.
"A. And he did, just almost a matter of seconds.
 "Q. Was he looking straight ahead — the man walking?
 "A. No, sir, he was kind of looking like that (indicating).
 "Q. And what happened immediately after he hit the car?
"A. Well, kind of stunned him like and he fell.
 "Q. Okay. And could you tell how fast the car was going?
"A. No.
"Q. Was he going fast, too fast for that area?
"A. No, he wasn't going fast."
This polemic evidence created an issue of fact, but the question remains whether it demonstrates an abuse of the trial court's wide discretion in determining not to grant relief under Rule 60(b)(6). Those disputed facts do not present an extraordinary or compelling circumstance requiring relief.Cf., Howell v. D.H. Holmes, Ltd., 420 So.2d 26 (Ala. 1982). Nor is there anything in such a vein presented in the amount of damages awarded. A review of the record discloses ample proof supporting the damages award. *Page 77